Next matter on our calendar is Allen, Harry & Others v. Total Gas & Power. I took it home yesterday. Thanks. Thanks. Morning, counsel. You may proceed. Good morning. May it please the court, I'm David Covell on behalf of the plaintiff's appellants. The plaintiffs here allege that defendants or various entities of a French-owned corporation, Total, manipulated and monopolized the natural gas market in the United States. And the mark is defined at paragraph 298 of the complaint. That's in the Joint Appendix 154 page. Plaintiffs are participants in that very market. You're treating the market as one unity, one thing, not the hubs, not the various regional hubs? We've pled the market as a wholly integrated market. These regional hubs, which are in southwestern United States, there are four of them, Permian, SoCal, El Paso, and Oaxaca. They're all very, I mean, from a geographical perspective, not too far from Louisiana, where the Henry Hub is. That's the most liquid, liquidly traded hub. It's a hub where the NYMEX futures, the contracts, deliver to. But we've alleged, and your clients, the plaintiffs, only traded at the Henry Hub. Isn't that correct? They traded futures at the Henry, no, not at the Henry Hub. They traded on the NYMEX. They traded on the NYMEX, which has delivery at the Henry. NYMEX actually trades here in New York. Right. But, yes, the delivery point for NYMEX futures is Henry Hub, and there's a physical trader also who traded physical products, financial products tied to the Henry Hub. So, yes, that's correct. But the overarching point here is that this is a wholly integrated market, and we've alleged it well, and that the lower court made a mistake to find that the market was something different. We can cite the Todd v. Exxon or the recent Wacker case by the Second Circuit. Both of which say this is a highly factually intensive issue. There are three reasons why it's very clear that this is a wholly integrated market. The first is, well, actually maybe four reasons. The first is that the defendants themselves, and this is highly important, they used movements in NYMEX futures to accentuate their manipulation of these hubs. So if you look at paragraph, go to. I mean, I think you've made the case that they're interrelated to some degree, but their trading and their manipulation was at the hubs for their own benefit. And that's your assertion, right? Absolutely. So the manipulation, just to be clear, the manipulation was at these four hubs, either upward or downward. So they weren't trying to benefit themselves by then trading on NYMEX or at the Henry Hub. They were manipulating these regional hubs because they're probably more easily manipulated. There's fewer transactions. And there were, what, 130 or 100 and so many trades that they did? Yes, they did. From a volume perspective and a percentage perspective, relative to these hubs, they were doing huge numbers. Relative to the hubs, not relative to the Henry Hub. Absolutely. Okay, fair enough. Absolutely. But the point is, this is a fungible commodity. The pipelines intersect. They are going to the similar locales of consumption and production, and that the academic studies we have show that these are co-integrated markets. If you look, it's- Counsel, let me try and understand the harm you claim. Yes. Do you claim that the alleged harm is caused by the fact that these prices move in the same direction? Absolutely. As the manipulated or that the defendants prevented that from happening through manipulative trading on NYMEX? I think the studies seem to point in both directions. Therefore, how was the harm caused? If you look at the complaint, paragraph 287 of the complaint, you'll see the consulting expert who was a professor from the University of Michigan, a professor of finance, he added allegations for us that show that the Henry Hub or NYMEX will move during the times of these manipulations. We focused on the CFTC four dates in question, four weeks. Will move the same way, just not by the same degree. That's consistent with the academic studies, which we cite, the Avalos study and the GEBRE study. Both of those show- the Avalos study concludes that this market is co-integrated and it's a whole market. How were the plaintiffs harmed? When the defendants total move the price of Waha, say, up 10 cents, they're also moving the price of NYMEX Futures up and Henry Hub up, not by the same degree because you can capitalize on, in a very short term, you can capitalize on a bit of a manipulation. How were the plaintiffs harmed? They were trading in every bid week at issue here. That's 38- well, 36 bid weeks. The manipulation was 38 times in 36 weeks. But they were trading every bid week at issue here. They're trading in a manipulated market. They're buying and selling. It's not our burden, I believe, and we followed a number of- What's the allegation in the complaint or set of allegations? In what paragraphs do you say, we were harmed and this was the harm? That's- well, the claim section makes it very clear that that was the harm. We cite to the trading- What was the harm? When the price of one market- not market, one regional hub goes up, the Henry Hub and NYMEX goes up. How did that hurt you? If you buy Futures at that time, you will have overpaid. Did you? Our clients, we are not- I mean, if you look at the Alaska Electrical case and the Forex case, if you've got- That's my question. Yes. Did you? Yes. Yes. By sheer- and this is the Alaska Electrical case. By sheer number of trades that occurred during this manipulation, it's impossible and this is a- Would you have been harmed? Yeah, it's a plausibility standard. Judge Furman's Alaska Electrical case makes it very clear. I'd also say a word about intent here. You're really talking about- you're talking about constitutional standing, justiciability of the case, aren't you? I mean, we'll get to whether your complaint pleads a claim under the Commodities Exchange Act, but your theory is, in essence, is that since where you were trading is reflective of a manipulation elsewhere, it then affected you and so you have a concrete injury that arises from that, right? Yeah, these are artificial prices. The district court below really kind of focused on the Commodities Exchange Act claim, whether you had pled it plausibly to reflect a claim under that act and then in a footnote said, well, I think that they don't have standing either in a constitutional sense, but it's quite conceivable that you might have standing in an Article III context, but that you won't have a claim under the Commodities Exchange Act, isn't it? Don't you have to plead with more particularity under the Commodities Exchange Act, direct injury as a result of manipulation of the market? We have pled enough direct injury here subject to- Have you identified the transactions that were inflated and to the extent that they were inflated? That's not our burden at this time when there's- So the answer to my question is no. We've- So if I disagree with you about the burden, then that answer then perhaps is fatal to your claim. So you say you don't have to do that? We don't have to do that. We've alleged that we- Does Alaska Electrical require you to do that? Alaska Electrical certainly does not. They just cited to trades in that case. All right. So let's talk about your trades. Did you identify trades that were affected? We identified trades during the-we said hundreds of trades during the manipulation. I mean dates and times. Alaska Electrical did not do that. Okay. So all you have to do is generally say that, well, the market was changed, altered, and we think we were injured, but we don't have to tell you, judge, district court judge, which trades are out. We do not have to prove damages at this time. That's correct. We do not have to- You have to allege damage. We have alleged harm. We have alleged harm. Specific harm. Specific and concrete. That's the language of the Tokyo. As far as I know, there's only one lower court case which requires the pleading of actual trades, and that's the LIBOR 2 decision. Let's go over to the intent side then. Yeah. A word about- How can you show an intent to manipulate the market when all the activity occurs in a regional hub that is tangentially related to a major- In which you do not trade. Yeah, in which they'd never trade. If you look at the Indiana Farm Bureau-if we're talking about the Commodity Exchange Act here in intent, if you look at Indiana Farm Bureau, the reason for a specific intent standard is to make sure that innocuous trading activity isn't confused for manipulative trading activity. It's not about focusing on which contract was manipulated. In other words-and this is the LIBOR 3 case. Judge Cottle actually follows it. The LIBOR 3 case says it clearly. If there's an intent to manipulate the commodity, then the markets that are affected by that-the mens rea standard from that is recklessness. And that's very clear also if you look at Rule 180.1. It's put into the code itself. It's put into the rule. It's a recklessness standard. So we have specific intent well, well pled for manipulation of these hubs. It's a constraint. Well, not if the market's different. Not if we see the market as being the hub market as opposed to a unified market. I agree that's the nub, but that's a factual question. That certainly is one that we've pled very well. If you look at the natural gas cases- Why isn't that a law question as to what the appropriate definition of the market is? I don't see how it's a fact question. Todd V. Exxon makes it very clear. We've defined the market the way it is. If you read those studies- Well, I know you've defined it, but maybe you've defined it wrongly in terms of what the legal standard is. Well, if you read the academic studies, ECF 102- Academic studies are interesting, but academics don't make law. Judges make law, and the legislatures make law. Markets follow academic analyses, and that academic analysis says this is one integrated market here. I agree that that's the nub. I agree that's the nub. I was going to reserve three minutes on- I'll reserve three minutes. I won't take any time. Thank you. Well, we're interested in your case, so we've given you a hard time. That's a signal of our interest in your case. Thank you, Your Honor. I have counsel for Total. Forgive me. I said Total before. Total. Counsel. Thank you, Your Honor. David DeBolt on behalf of the Appellees. I'd like to start with what this case is and isn't about. Plaintiffs lose because even accepting everything that FERC and the CFTC say in their allegations, no plaintiff here has identified a single trade for which the alleged conduct plausibly caused that plaintiff injury, and that was really at the heart of the district court's ruling in this case. There are two flaws that combined cause that result to be the correct one. First, plaintiffs who did not buy or sell in any of the regional markets where they say there was manipulation rely entirely on cases where, as the district court put it, the allegations of damages were based on either direct manipulation of the price of the instruments that the plaintiffs transacted in, and that, for example, is the Wacker case and the crude oil 2012 case, or the price of the commodity or index underlying those instruments was manipulated, and that's the Alaska electrical case. The price or index for which their commodity, for which their futures were priced, was manipulated by the defendants. That's Alaska electrical. It was the so-called ISDA fix. It was a benchmark that was used by the plaintiffs in their contracts for the value of whatever they invested in. And why was that not manipulated here? Because here, what they're claiming is that the defendants caused the regional market index price in particular months to be raised or lowered by a small amount, so that that regional price would either move closer to or further away from the index that's relevant here, which is the Henry Hub price. They claim to have traded only in instruments that were tied to the Henry Hub price, and that was neither the— or infer that the Henry Hub price was manipulated when the regional market price was manipulated. Well, the district court here said that there are two reasons why you can't make that inference, or at least it isn't plausible that their particular trades were affected by this, and that gets to the second flaw I was about to get to, which is that the manipulation here, unlike that in LIBOR and other cases, was an episodic and varying in direction type of manipulation. It's trader-based manipulation. In one month, they say that they were pushing a regional price up. In fact, in some months, they say we were pushing the regional price up in one region and down in another. And it did not happen in 37 of the—it did not happen every week that's relevant. You're not denying that that was that manipulation. I think you were already fined. No, we were not fined. We settled with the CFTC, and the FERC is taking its time deciding whether it's going to take what the enforcement staff has alleged as a basis for proceeding. You settled without any admittance of liability? It was a no admission or denial, and we reserve the right to contest litigation in cases like this or the type of litigation you might expect, which would be a litigation by somebody who actually traded in these instruments or traded in the regional physical markets. But that's not what we have here. And the point I was getting to is that when you have a manipulation, an alleged manipulation that is episodic, varying in direction, doesn't happen all the time, it's in that situation that Judge Buchwald in the Libor decision said, you've got to tell us what you traded and when so that we can figure out whether you were actually potentially injured by this to get from conceivable to plausible. Now, Judge Buchwald did not require that for the allegations where the plaintiffs alleged that the defendants all got together to consistently suppress the Libor rate over the entirety of a four- or five-year period. In that situation, you can presume injury. Uniform conduct to achieve a goal. Exactly. And the effect of that, you don't require the plaintiffs to try to tease out, well, how much was it manipulated? We know it was manipulated the entire time period if we accept the plaintiffs at their allegation. So you don't require them to plead specific trades. But you do require the pleading of specific trades. Were they short or were they long? What future price were they tied to? Was it the next month or was it further out? Excuse me. Did they have offsetting positions? Those types of details are needed to know whether we're getting from the conceivable or possible, which is not a sufficient claim, over to the line of plausibility. And that's exactly where the district court went in this case. And the plaintiffs were told early on, look, you need to plead this. That was our argument. You need to plead this. And the district court said to them, look, make your decision. Are you going to plead it or not? And they decided not to, and they have to live with that decision. They had four opportunities to amend their complaint, and in not one of them did they give these kinds of details. In fact, I'd like to point out they cite to one case, the Seventh Circuit case, I believe it's the Cohen case. Yes, Cohen v. Pimko. And they claim, well, that case says we don't have to plead specifics. But actually, in that case, the court of appeals said we're not going to get into the issue of whether they adequately pled loss causation because the plaintiffs there gave us sufficient information to know that they sold out a short position at a time when the defendants had inflated the price artificially. So even the cases they rely on point to this need to show some connection besides a possible or potentially conceivable one in order to make their case. The only case that's even close to this one is the Hershey case, the Fifth Circuit case, where that court of appeals ruled against the plaintiffs on yet a different problem, the failure to adequately plead specific intent. The underlying for the contracts that they traded in is natural gas at Henry Hub. It's not natural gas anywhere. And the Hershey case, dealing with facts very similar to this, manipulation at a regional hub, in that case the Houston Ship Channel, in order to change the spread so that the defendants allegedly could profit from the spread between the Houston Ship Channel price and the Henry Hub price. In that case, there was no specific intent, purpose, or conscious object to manipulate the price at the different location, the Henry Hub. And the plaintiffs have no good answer to that decision, which is on all fours with this case, in which this court in the Amaranth decision cited specifically for the requirement of specific intent. Counsel, what if we concluded that they had standing? Would that make a difference in the outcome of the case? If they had ‑‑ so there's two types. Actually, there's three. Constitutional standing. Yeah, there's constitutional standing. There is an argument that that standard is lower, but they still have to meet what's called statutory standing, which is somewhat of a misnomer. It's not a jurisdictional. It seems to me that constitutional standing is established by the fact they show some connection between the activity of the regional hubs and its impact upon the Henry Hub. But then they don't have to show direct causal link between their specific traits or constitutional standing. But once they get to the statute, then they have to show that they suffered economic losses on the trades they made. If we found standing, would that save the plaintiff's case? Or would we find standing and then cold comfort in the winter or dismiss anyway or affirm the district court? You could find Article III standing, as Judge Wesley was suggesting, but they still would have to meet the statutory element of actual damages, plausibly alleged. That has been called statutory standing because the statute is clear that you can only cover for actual damages that you personally incurred as a result of a violation of the law. But the law gives he doesn't have to do it at this stage of the proceeding. He doesn't have to prove it, but he has to plausibly allege that they suffered some actual damage. And when you, for the reasons I said earlier, Judge Codall wisely decided, look, in this situation, you're alleging that it affected prices distant from where the alleged manipulation occurred. Episodically, if you look at the chart at page 415 or 416 of the joint appendix, you'll see this happened no more, it happened 11 weeks out of the 52 weeks in 2011. And the other three years, 2009, 10, and 12, it happened no more than five weeks out of each of those years. This is not something that was happening persistently like it happened in LIBOR when they were dealing with the part of the case where the defendants were all setting the LIBOR rate every day of every month of every year. So when you combine those two factors, distant, possible ripple effect, episodic and varying in direction, that's when you need to allege what specific trades and how this manipulation affected a particular trade, at least one for one of these plaintiffs in order to be able to plausibly state that they suffered actual damages, which is a requirement of not only the Commodities Exchange Act, but there's also a requirement of antitrust standing, which for a number of other reasons, if you don't find that they fail to have an injury, actual injury, if you do find they meet that threshold under the Commodities Exchange Act, you have even additional hurdles to establish antitrust standing. And I think our briefs fairly well lay out where that problem is for the— Mr. DeBolt, let me ask you one question. Is it conceivable under the allegations as—sorry, looking at the fact that the plaintiffs traded in the way that they did, is it conceivable that what I will term the manipulation—you don't have to acknowledge that—actually benefited them at some instances? Yeah, it's conceivable that—it's probably more conceivable that it didn't have any effect on them at all, just given the nature of the scheme that they allege. But, yeah, if they were affected, it's also entirely possible, indeed plausible, that they were benefited. And that's one of the points that Judge Buchwald made in the Live War II and Live War III decision. It's not in and of itself enough, but it's part of sort of understanding what they're trying to get around here by not making those types of allegations. Thank you, Your Honor. Thank you, counsel. Mr. DeBolt, you reserve three minutes for rebuttal. Quick point. I think Mr. DeBolt, my friend, just conceded that there was an impact on futures because it could impact upward as well as downward. It could benefit the plaintiffs here or it could harm the plaintiffs here. That's essentially— But there's no actual injury of a plaintiff alleged because of this upward and downward movement. The lower court's whole decision turned on the one point, which is that there's no danger of this impacting Henry Hub. Mr. DeBolt just conceded that there is a danger. He just disagreed with the lower court. And everything flows from that point. I don't think the lower court said that there was no danger that it wouldn't. I mean, it said that the impact might be insignificant because of the number of the trades. But even having said that, he said that there were some that were trading long, some that were trading short. And when you have a varying strategy, either driving the price up or driving the price down, then you have to be more specific with regard to your trades to show your injury. Well, persistent and episodic is in the eye of the beholder. But an entire week—and if you turn to paragraph 259 of the complaint, it's more than just one week that we've alleged. But an entire week of manipulation five times a year for three years and 11 times a year. Right, and I'm looking at how many times they tried to drive the price up or tried to drive the price down at 415 and 416, as alluded to by your opponent. And there are as many red dots as there are blue. There are. I mean, this is not a time to come up with damages. Let me ask you this, given your opponent's concession and your belief in that fact. Is it conceivable that on some of those trades you benefited by their manipulation of the market? That's right. It's conceivable, right? Yes. Okay. But you're not suing to get the money back, are you? No, and the way these cases have worked at the lower courts is when it's time to prove damages, you net out the benefits from the harm, and the people who are harmed get— But you still have to plead injury. You certainly have to plead injury, Your Honor. Okay. Are you certain there was injury without any specifics? I'm certain that our clients traded in a manipulated market, yes, bought and sold. And that's enough? The nature of—yes. And if you look at the— What if all of the trades sort of netted out at zero? The Alaska—that's a good what if, but the Alaska electrical case says it has to be plausible that someone was injured, and that's the standard we went by. And we don't agree that this is episodic manipulation. During the course of a week, it's more than episodic. It's actually during the course of the whole week. The index publishes the following week. They put on the positions prior to that week. That is honestly a damages question that we need to address. Do you disagree with the district court's characterization of episodic? Absolutely, Your Honor. Okay. Absolutely. But we also disagree with the whole dichotomy here. If you look at the crude oil case, Judge Pauly's case, that's very clear. His finding of injury under the Commodity Exchange Act is that they traded in a manipulated market. Trading in a manipulated market is sufficient. By itself and injury. Gold and silver both say that as well. On the aluminum case for antitrust injury, just quickly, and this is an important point, paragraph 96 and paragraphs about 220 to 230 of the complaint make it very clear how integral NYMEX futures trades were to the manipulation, granted to the manipulation at these hubs. But the NYMEX futures prices were part and parcel of this manipulation. And so this distinguishes and is a limiting factor of this case that is actually consistent with aluminum because this is the same market. The scheme occurred in the futures market. We're limiting it here. We're not downstream purchasers who disavow any relationship to the market in question. Thank you. Thank you. Thank you so much. Thank you both. Thank you, Your Honor. We'll reserve the session.